No. 2829.—AGNES RODRIQUEZ, WIDOW MICHEL CORMIER *v.* CHARLES GUERINIERE BIENVENU

The abolition of slavery by the sovereign power put an end to all contracts depending for their existence on that condition, and as the contract for the hire of slaves could not have been made without the existence of a state of slavery, the destruction of that relation by the sovereign power destroyed the contract, and the obligation given as the evidence of such contract, is null and void

Slavery, as it formerly existed in the United States, only gave to the owner the right to the labor of the slave during his life, and the destruction of slavery carried with it the destruction of that right. It makes no difference whether the contract is made for the sale of the slave or whether it is for the hire. In the one case it is for the services of the slave for an indefinite period, and in the other it is for a fixed period of time. The contract is equally null in both cases.

APPEAL from Third Judicial District, parish of St. Martin. *Train,* J. *Garry & Fournet,* for plaintiff and appellee. *DeBlanc & Perry,* for defendant and appellant.

TALIAFERRO, J. The plaintiff brings this action to recover the amount of a promissory note executed, as she alleges, in her favor, by the defendant, on the first of March, 1864, for the sum of eight hundred and eight dollars, with interest, at eight per cent. per annum, from the seventeenth of December, 1864. On the twenty-seventh of September, 1866, the defendant filed an answer, in which he avers that the note was furnished for the value of the services of slaves, fixed according to the standard of Confederate money in 1864, and were to be paid in that currency. That he ought not now to be required to pay more than the value of that sum, in Confederate money, at that time estimated by the lawful currency of the country.

On the fourteenth of June, 1869, the defendant filed a supplemental answer, in which he avers that the consideration of the note being for the hire of slaves, it is null and void, and prays that the plaintiff's demand be rejected, and that he have judgment in his favor.

There was judgment for the amount claimed in favor of the plaintiff, and the defendant appealed.

We find two bills of exceptions in the record; but it is not necessary in deciding this case to consider them. It is not denied that the consideration of the note was the value of the services of slaves hired by the plaintiff to the defendant.

The ownership of persons, as it formerly existed in this country, can not be said to have extended beyond the right of the owner to exact, for his own use and benefit, the labor and services of the person subjected to that ownership without remuneration to him. The person hiring a slave, had this right during the term of the lease to the same extent that the owner had. Both the owner and the hirer were entitled by the laws that then existed, to exact from the slave, his labor, without recompense to him. The hirer had, however, to account for the hire of the services to the owner of the slave. Then, the difference between the right of the owner and that of the hirer, consisted only in the duration of the right and in the obligation of the hirer, to pay the owner of the slave for his labor and services. In the one case, the labor and services were to continue an indefinite period of time—that is, during the life of the slave. In the other case, a fixed term was established. By the abolition of slavery, all contracts existing at the time, relating to the sale of slaves, were annulled. The sale of a slave being, in substance, the sale of his services for life, the obligation, which was previously binding upon the purchaser, to pay for these services received, and to be received, became extinct. In like manner the obligation of the hirer to pay for the services, of the slave for a fixed period, was canceled.

It is of no importance whether the period of the hire of the slave had terminated or not before the time of the extinction of slavery, nor whether the contract was valid prior to that time. With the end of the status or condition of slavery, every contract founded upon, or growing out of that condition, necessarily came to an end also, whether such contract was previously valid or not. As well might it be decreed that the purchaser of a slave who had never paid any part of the stipulated price, and who had received the services of the slave for years before emancipation, should pay for these services, as to decree that the hirer of a slave should pay the stipulated hire, which became due before that event occurred. True, in the one case, there was a special contract for hire; in the other, there was not. But the analogy of the two cases is so strong, that whatever equity would require in the one case, it would equally require in the other. The existence of a state of

slavery, sanctioned by law, lay at the foundation of the contract of hire of slaves. The laws, which authorized and enforced the contract, were necessarily abolished by the subversion of slavery. Persons could no longer be sold or hired. Existing obligations for the price or the hire could not be enforced, for there was no longer any law authorizing their enforcement.

It will not do to say that these existing obligations were not impaired by the act of emancipation, and could not be. The high behest of the sovereign power is uncontrolled by prohibitions which restrain ordinary legislation. Its force destroyed all the objections depending for their efficacy upon the existence of laws maintaining slavery. Courts were therefore left without authority to enforce contracts of this character.

The case of Dickinson *v.* Maynard, 20 An. 66, in which this court awarded a small sum to the plaintiff, constructively, as hire of a slave, was not a suit for hire of slaves, but for damages on account of an attachment wrongfully sued out by the defendant. The award was virtually in the nature of damages, and made on the authority of Phelps *v.* Coggshill, 13 An. 440. In this, as well as in another important feature, that case differs widely from the one before us.

In the case of Tate, administrator, *v.* Fletcher et al., 19 An. 371, the judgment of the district court was reversed, as to that part of it which allowed the plaintiff hire for a slave, and the decision was based upon the doctrine of the case of Wainwright *v.* Bridges, 19 An. 234, then recently decided. This we consider as the settled doctrine in regard to the question of the right to recover the hire of slaves.

It is therefore ordered, adjudged and decreed that the judgment of the district court be annulled, avoided and reversed. It is further ordered that there be judgment in favor of the defendant, the plaintiff and appellee paying costs in both courts.

---

WYLY, J., *dissenting.* I can not concur in the opinion of the majority of the court on the question presented in this case, to wit: Whether a note given for the hire of slaves before emancipation can be collected in the courts of this State.

Contracts for the sale of persons can not be enforced under article 128 of the constitution, and under the settled jurisprudence of this State; but our constitution and our jurisprudence will be searched in vain to find any prohibition whatever against the enforcement of contracts of the character herein presented. But it is argued that the contract of hire is analogous to that of sale, and as the high behest of the sovereign power, which is without control, has emancipated slaves, its force destroyed all obligations depending for their efficacy upon the the existence of laws maintaining slavery.

I can not admit the correctness of the proposition. The contract of hire is not a species of sale; it differs from it as widely as it is possible for one class of contracts to differ from another.

When the note sued on was given, the services had been rendered under the contract of hire, the defendant having received full and complete consideration.

The contract evidenced by the note did not in the least depend upon the continued existence of slavery. Whether the laws would tolerate the institution of slavery for a limited or indefinite period after the term of hire had elapsed, could in no manner concern the defendant. It could have no possible bearing on his obligation, which had become absolute. No eviction by emancipation could affect the valuable consideration already received by him in the services of the slaves which he had hired from the plaintiff.

The consideration of the note was labor performed, a consideration as valuable as that of borrowed money, or any other, necessary to make a contract valid. After the services had been rendered, the obligation to pay the price became absolute, and whether the owner of the slaves was subsequently evicted on account of defective title, or from any other cause, it did not in the least affect the consideration already received. The continued existence of slavery could add nothing to the advantage of the hirer, who had already enjoyed the benefits of the services he contracted for.

The object of the contract of sale is the ownership of the slaves and their children, and it may well be said that the parties to such an agreement contracted with reference to the continued existence of slavery. But, in making the note sued on, the parties merely contracted for the purpose of liquidating a debt, the consideration of which had already been received.

In reference to the contract of sale, it has been argued, with some force, and there is equity in it, that as slavery lay at the foundation of the contract, when there was an intervention of paramount power rendering it impossible, by emancipation, for the intention and purposes of the contract to be carried out, both parties should be released. This argument has no application to the contract before us. The defendant, who has already received the services he contracted for, can make no appeal to equity.

I can see no possible reason for refusing to enforce the contract before us. Certainly, the framers of our constitution did not intend to prohibit the courts from doing so, because they took care to consider the slave question, and they deemed it necessary only to prohibit the enforcement of contracts for the sale of persons; there was no inhibition applied to the existing contracts of hire. It is well known that no prohibitory law can be extended by implication. It must be construed strictly. Whether the contract of hire resembles the contract

of sale or not, it is quite certain that article 128 of the constitution can not be legitimately applied to prohibit its enforcement.

Immorality is the only ground—it is the only position having the merit of plausibility—which the defendant can take in his defense. And that is not a substantial one. Although it has not been urged by the defendant, I deem it proper to give it some consideration.

The hiring, in the case before us, occurred before emancipation. The laws then in force, and forming a part of the contract, declared it lawful to hire slaves. It was then just as legal to hire slaves as to rent land, or make any other contract for the use of another's property. Our codes are filled with articles on the subject of slavery. Our jurisprudence is filled with cases in which contracts for the hire of slaves have been adjudged lawful and obligatory. After hundreds and thousands of decisions embraced in our reports, can this court now say that it was not lawful to hire slaves before the rebellion? After enforcing contracts of this character in a uniform current of decisions for over fifty years, can this court consistently say that the contract before us, made under the same laws as those which have already so often received its sanction, is a contract that was immoral—that it was reprobated by law? Surely not. We can not say that our illustrious predecessors degraded this tribunal by encouraging immorality—by hearing guilty suitors, and by entertaining and enforcing contracts reprobated by law. But, it is said, the law has been changed since emancipation, and it is now immoral to hire a person as a slave. So it is. But does the law upon this question, since emancipation, have effect upon contracts made before emancipation? Is the validity of the contract, or its morality to be tested by the laws now in force, or those in force when it was entered into ? What laws entered into and formed part of the contract of hire in this case, which was before emancipation ? Was it the then existing laws, or those that have been passed since ? The question scarcely needs an answer. When the contract was made, the laws then in force were necessarily a part thereof, as far as not modified by the parties. And if it was then moral and valid, which it was, the contract ever afterwards remained moral and obligatory. This is elementary. The validity of a contract—and of course it could not be valid without being moral—must be determined by the laws in force at the time it was entered into. It can not be tested by posterior laws. This has undoubtedly, over and over again, been declared by this court, and by the courts of every nation in the civilized world.

Can we now say that the principle I have mentioned is not correct, and that a contract, moral and valid at the time it was made, may become invalid and immoral by posterior laws ? I think not. I think the doctrine of immorality is unsound and inapplicable.

To my mind it is manifest that the note before us, which was given

prior to emancipation, for services already rendered, was not affected by the subsequent abolition of slavery; it did not depend for its validity upon the continued existence of slavery, and it did not fall with that institution. The President of the United States emancipated slaves, in the exercise of his war power. It was an incident to the war power confided to him, and in his proclamation he expressly declared it as a war measure. Did the exercise of a war measure, in the midst of the great rebellion, abolishing slavery, necessarily destroy the contract before us? Was its destruction an incident of the war power? Was it in any manner necessary to suppress the rebellion? I think not. I believe that the contract before us was not destroyed by the high behest of the sovereign power; and in issuing his proclamation of emancipation, the President of the United States never designed impairing the obligations of contracts of this character.

Where the contract is not tainted with immorality, and where there is no inhibition by paramount authority, it should be enforced by the courts of this State.

I therefore feel constrained to dissent from the opinion of the majority of the court in this case.